Application of NORTHWESTERN BELL TELEPHONE COMPANY

(6 N. W.2d 165.)

(File No. 8509. Opinion filed November 14, 1942.)
Rehearing Denied January 4, 1943.

H. A. Poley, of Omaha, Neb., F. G. Warren, of Sioux Falls, and H. G. Burke, of Omaha, Neb., for Appellant.

Roy D. Burns, of Sioux Falls, and Wm. Williamson, of Pierre, for Respondent Public Utilities Commission.

DENU, Circuit Judge. On June 12, 1939, the Northwestern Bell Telephone Company, appellant herein, made application to the Public Utilities Commission of the State of South Dakota for authority to increase its Sioux Falls exchange rates. The proposed increase was from $4.50 to $5.50 per month for one-party business rates; from $3.50 to $4.50 per month for two-party business rates; from $2.50 to $2.75 per month for one-party residence rates, and from $2.25 to $2.50 per month for two-party residence rates. The Company also proposed to introduce a new type of service called "Incoming Line Service" at $4.50 per month, to accommodate the needs of a part of its business subscribers. These new rates were to go into effect on July 28, 1939.

In its application for authority to so increase its exchange rates, the Telephone Company alleges that the existing exchange rates were unjust and unreasonable and had not for several years last past produced a fair return on the fair value of its exchange property. The application also alleges that the proposed increased exchange rates would yield no more than a fair return on the fair value of its Sioux Falls exchange property.

A hearing before the Public Utilities Commission was duly had on the Telephone Company's application at Sioux Falls, South Dakota, on September 12, 1939, at which hearing evidence was introduced by the Company, the Commission, and the City of Sioux Falls. On October 23, 1940, the Commission filed its report and made and entered its order to the effect that the existing exchange rates in Sioux Falls were adequate and reasonable, and dismissed the Company's application for increased rates. A rehearing, applied for by the Company, was, by order, denied by the Commission on January 11, 1941. The Company thereupon appealed from the orders of the Commission to the Circuit Court of Minnehaha County, South Dakota, and on October 7, 1941, that court, after hearing, filed its decision and judgment, affirming the Commission's orders of October 23, 1940, and January 11, 1941. It is from that decision and judgment of the Circuit Court that this appeal is taken by appellant Company.

The assignments of error challenge the decision and judgment of the Circuit Court, and the orders of the Commission, on the ground, among others, that such orders of the Commission are unreasonable and deny the Company the opportunity to earn a fair rate of return on the fair value of its Sioux Falls exchange property, in violation of statute and the due process clause of the State Constitution. In other words, the issue of confiscatory rates, as distinguished from compensatory rates, is expressly presented by the record of this case.

It appears from the transcript of the testimony and the report of the findings of the Commission that the Com-

pany's net operating income under existing rates; an estimate of the net operating income under the proposed rates, had they been in effect; and the fair value of the Company's Sioux Falls exchange plant, devoted to the exchange service, were the three essential facts sought to be established. Obviously these are the basic facts necessary to determine the rate of return.

■ The Commission found that the net operating income of the Company for 1938, under existing rates, was $30,653.20, and that the fair value of the Company's property, used in exchange service at Sioux Falls was $876,110. It also found that under the proposed exchange rates the net operating income would have been $64,005.75. The Commission did not compute the rate of return, and there is no specific finding in its report showing what the rate of return is. But the rate of return is determined by dividing net income by the fair value of the property. If we do that, the rate of return is 3½%, computed on what the Commission found to be net operating income and the fair value of property.

The Commission's report shows that its net income figure of $30,653.20 was reached by taking from the toll income of the Company for alleged use of exchange facilities making toll calls, the sum of $5,393.47 and weaving this sum into the actual net income of the exchange service, to-wit, $26,417.49, reflected in the books and records of the Company. These books and records were examined by two expert accountants, one called as a witness by the Company and one by the Commission. They agreed that the books of the Company showed a net income of $26,417.49 for 1938 for exchange service under existing rates. There is no other testimony in the record on this subject.

■ It appears also that on May 11, 1926, the Commission had made an order, which is still in effect, requiring the Company to include in its exchange service and rates the use of local facilities by exchange subscribers in making and terminating toll calls. The order, in effect, denies

the Company the right to charge for the use of local facilities in its intrastate toll rates. It, therefore, precludes reimbursement from toll income of any sum whatever for the use of exchange facilities.

The undisputed proof establishes the figure of $26,-417.49 as the net income for exchange service for the year 1938 under existing rates, as shown by the Company's books and the testimony of the accountants who examined those books.

In estimating the net income under the proposed rates, the Commission likewise included the toll reimbursement sum aforesaid.

■ The Commission found that the fair valuation of the Company's exchange property was $876,110. The book cost of the Company's exchange plant was admittedly $1,-155,889.26. But this basis, though recognized frequently by the courts as a proper basis of valuation, was not used by the Commission, nor urged by the Company, for the obvious reason that it gives a much greater value than the so-called "reproduction cost new" basis. It was this latter basis or method which the Commission adopted to measure the fair value of the exchange plant, and this method, in which it is determined what it would cost to reproduce the plant at the present time, less accrued depreciation, is also recognized by the courts as a proper way to ascertain fair value of a utility's property as the rate base. The figure of $876,110, found by the Commission, is in sharp conflict with the estimate made by the Commission's own witness, Hamilton, who found the fair value to be $947,731, and by the Company's witness, Cronland, who found that value to be $967,208. The difference between the Commission's figure of fair valuation and Hamilton's and Cronland's figures is accounted for by the Commission's exclusion of part of the computed interest sum during construction allowed by the witnesses, and the Commission's rejection of going concern value, also allowed by both witnesses. The difference between Hamilton's and Cronland's figures is accounted for by Hamilton's restrictions of what should be allowed for

working capital requirements. The record shows that Hamilton is an engineer with many years' experience, and that Cronland is an accountant with many years' experience. They are the only witnesses who testified on fair valuation, which was ascertained by the reproduction cost new method adopted by the Commission. The result of the calculations, employing the figures of the Commission as to net income and fair valuation, is a rate of return of 3.5% under existing rates and 7.3% under the proposed rates; and employing the figures of Hamilton and Cronland the rate of return is 2.76% under existing rates and 5.92% under the proposed rates.

The statutes of this state provide for appeals from the Commission to the Circuit Court, and from the Circuit Court to the Supreme Court, and for a trial in the appellate courts upon the record made before the Commission.

"In all actions or proceedings in which the validity, lawfulness, or reasonableness of any final order or determination of the Public Utilities Commission shall in any wise come in question, the original or certified copy of the final record made before said Commission shall constitute the record in said cause, and no new evidence shall ever be received or introduced; but the case shall be heard and determined upon the final record provided for in this chapter." SDC 52.0502.

"The Circuit Court in its determination of said cause may affirm, reverse, or modify, such order or determination of said Commission, or remand the cause to the Public Utilities Commission with directions for further proceedings." SDC 52.0504.

The appeal from the Circuit to the Supreme Court is likewise heard on the settled record made before the Commission, and such appeal to the Supreme Court is the exclusive remedy to review, reverse, correct or annul any action of the Commission. SDC 52.0505 and SDC 52.0506.

■ That the statutes make no reference to the conclusiveness of the findings of fact by the Commission is no ground for saying that the legislature intended the Circuit

or Supreme Court to try the case de novo, weigh the evidence, consider matters of a purely administrative nature and substitute its discretion for that of the Commission. Application of Dakota Transportation, Inc., of Sioux Falls, 67 S. D. 221, 291 N. W. 589, 594.

On the contrary, this Court holds that "in a proceeding to review an order of the Commission, administrative or legislative in nature, judicial action cannot supplant the discretionary authority of that body. The review by the court exercising judicial functions only cannot extend beyond the questions whether the Commission has acted within its constitutional or statutory powers and whether its order or determination is supported by substantial evidence and is reasonable and not arbitrary." Application of Dakota Transportation Inc., of Sioux Falls, supra.

The case just cited refers with approval to the decision of the United States Court in St. Joseph Stock Yards Co. v. United States, 298 U. S. 38, 56 S. Ct. 720, 725, 80 L. Ed. 1033, holding that an exception of the rule of finality is recognized where constitutional questions with respect to confiscation of property are involved.

The State Constitution (Art. VI, §§ 2 and 13) and the United States Constitution (Amendments V and XIV) provide alike that no person shall be deprived of life, liberty or property without due process of law, and that private property shall not be taken without just compensation.

These constitutional provisions have been many times applied by the courts in public utility cases in which it was sought to fix rates. Perhaps the strongest and best language of its application is found in the opinion of Chief Justice Hughes in St. Joseph Stock Yards Co. v. United States, supra. The opinion says: "The fixing of rates is a legislative act. In determining the scope of judicial review of that act, there is a distinction between action within the sphere of legislative authority and action which transcends the limits of legislative power. Exercising its rate-making authority, the Legislature has a broad discre-

tion. It may exercise that authority directly, or through the agency it creates or appoints to act for that purpose in accordance with appropriate standards. The court does not sit as a board of revision to substitute its judgment for that of the Legislature or its agents as to matters within the province of either. * * * When the Legislature itself acts within the broad field of legislative discretion, its determinations are conclusive. When the Legislature appoints an agent to act within that sphere of legislative authority, it may endow the agent with power to make findings of fact which are conclusive, provided the requirements of due process which are specially applicable to such an agency are met, as in according a fair hearing and acting upon evidence and not arbitrarily. * * *

"But the Constitution fixes limits to the rate-making power by prohibiting the deprivation of property without due process of law or the taking of private property for public use without just compensation. When the Legislature acts directly, its action is subject to judicial scrutiny and determination in order to prevent the transgression of these limits of power. The Legislature cannot preclude that scrutiny or determination by any declaration or legislative finding. Legislative declaration or finding is necessarily subject to independent judicial review upon the facts and the law by courts of competent jurisdiction to the end that the Constitution as the supreme law of the land may be maintained. Nor can the Legislature escape the constitutional limitation by authorizing its agent to make findings that the agent has kept within that limitation. Legislative agencies, with varying qualifications, work in a field peculiarly exposed to political demands. Some may be expert and impartial, others subservient. It is not difficult for them to observe the requirements of law in giving a hearing and receiving evidence. But to say that their findings of fact may be made conclusive where constitutional rights of liberty and property are involved, although the evidence clearly establishes that the findings are wrong and constitutional rights have been invaded, is to place those rights at

the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards. That prospect, with our multiplication of administrative agencies, is not one to be lightly regarded."

Confiscation is merely the taking of private property without just compensation, and offends the Constitution. If the property itself is taken by eminent domain, just compensation is its value at the time of taking. If the legislature, either by its own act or through the creation of an administrative agency, prescribes rates or charges for a public utility, the use of the property is taken, and just compensation is a reasonable rate of return upon the value of the property at the time it is being used for the public service. In other words, a utility is entitled to rates that will yield a reasonable rate of return after payment of operating expenses, taxes and financial charges, for the use of the property devoted to public service. Anything less than that is unfair and unreasonable. West et al. v. Chesapeake & Potomac Telephone Co. of Baltimore, 295 U. S. 662, 55 S. Ct. 894, 79 L. Ed. 1640; Board of Public Utility Commissioners et al. v. New York Telephone Co., 271 U. S. 23, 46 S. Ct. 363, 70 L. Ed. 808; Baltimore & Ohio R. Co. et al. v. United States et al., 298 U. S. 349, 56 S. Ct. 797, 80 L. Ed. 1209.

Many expressions are found in the decisions as to what amounts to a fair or reasonable rate of return. Thus it is said in effect that the rate of return should equal that demanded by investors on investments having business risks comparable to the utility in question. Willcox et al., Constituting the Public Service Commission of New York v. Consolidated Gas Co. of New York, 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A., N. S., 1134. It should be sufficient to assure confidence in the financial soundness of the utility and adequate to maintain its credit and to raise money necessary for the proper discharge of its public duties. Bluefield Water Works & Improvement Company v. Public Service Commission of State of West Virginia et al., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176. It should be

something more than current interest on mere investment, and should be sufficient to provide an amount to be passed to the surplus account after paying reasonable dividends. United Railways & Electric Company of Baltimore v. West et al., 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390. It should be more than the rates of yield on bonds which are substantially less than a reasonable rate for a utility. McCardle et al. v. Indianapolis Water Company, 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316. These holdings may serve the Commission as guides in determining a fair and reasonable rate of return.

We have found many cases holding rates of return of utilities ranging from 6% to 8% to be fair and reasonable. Respondent's counsel have cited one case where a state court held a return of 5% reasonable, and a Federal decision, 33 years ago, holding that 6%, embracing 2% for depreciation, could not be deemed confiscatory under the facts and circumstances of that case. They also cite the decision of the Commission for the State of Washington in Department of Public Service of Washington v. Pacific Telephone & Telegraph Co., 37 P.U.R., N. S., 321, to the effect that 4½% was a fair rate of return for the telephone company. But that decision of the Commission was reversed by the Superior Court of Washington, declaring that rate confiscatory and that "a fair return upon such fair value is not less than 6%." We have found no court or commission which ever held that a rate as low as 3½% was a fair or reasonable rate of return for a utility.

In the light of these many decisions, we must conclude that the rate of return of 3½% found by the Commission in this case is not a fair and reasonable return, but is clearly confiscatory. This conclusion compels a reversal of the judgment of the Circuit Court and a remanding of the case to the Commission with instruction to approve. a schedule of exchange rates that will yield a fair return on the fair valuation of the Company's exchange. property in Sioux Falls.

 In performing this important task, quasi judicial in character, we must remember that there is such a thing as procedural due process in administrative proceedings. In the concurring opinion of Justice Brandeis, in St. Joseph Stock Yards Co. v. United States, supra, it is said that an order of an administrative tribunal may be set aside for any error of law, substantive or procedural. The court may set aside an order for lack of findings necessary to support it; or because of findings made without evidence to support them; or because the evidence was such that it was impossible for a fair-minded board to come to the result which was reached; or because the order was based on evidence not legally cognizable; or because facts and circumstances which ought to have been considered were excluded from consideration; or because facts and circumstances were considered which could not legally influence the conclusion; or because it applied a rule thought wrong for determining the fair value of the property. These and other matters involve errors of law or irregularities of procedure. St. Joseph Stockyards Co. v. United States, supra.

 The principles announced in the above opinion are applicable to some extent, at least to the record in this case. The injection by the Commission of the so-called reimbursement toll fund into the net earning sum of the Company under existing rates is obviously an error of law.

██ ██ The rejection by the Commission of the going concern value found by the expert witnesses to be $54,810 was an error, in view of the use by the Commission of the reproduction cost new method in determining fair value. It is true that there is no requirement that going concern value be separately stated and appraised as such, because valuations for rate purposes can be made by valuation of a business assembled as a whole without separate appraisal of the going concern element. But such value must be recognized. Federal Power Commission et al. v. Natural Gas Pipeline Company of America et al., 315 U. S. 575, 62 S. Ct. 736, 86 L. Ed. 1037, decided by the United States Su-

preme Court on March 16, 1942, But, admittedly, the Commission did not appraise the exchange plant assembled as a whole and cover in its finding the item of going concern value. It rejected that item in toto after accepting the estimate of its witness Hamilton on fair value, based on the reproduction cost new method less accrued depreciation. The language of the Supreme Court in the Natural Gas Pipeline Company of America case, supra, is to the effect that going concern value must be allowed somewhere. It was held that it must be allowed under the reproduction cost new theory. Denver Union Water Co. v. City and County of Denver et al., 246 U.S. 178, 38 S.Ct. 278, 62 L.Ed. 649. Pacific Telephone & Telegraph Co. v. Whitcomb et al., D. C., 12 F.2d 279. In the instant case it was allowed by the only witnesses who estimated the fair valuation and testified at the hearing. The Commission erred in rejecting the only competent and undisputed evidence in the record on this subject. Going concern value is the element of value in an established plant doing business and earning money over one not thus advanced. It is a property right and should be considered as a factor in valuation of a rate base. The witnesses properly allowed this item of value in determining the fair valuation of the Company's exchange property.

The expert witnesses likewise properly allowed interest during construction. Under the reproduction cost new theory, which assumes a rebuilding of the entire plant new, interest during construction, estimated in this case for two years, was and is a cost associated with reconstruction. Swancutt for the Company, and Hamilton for the Commission, testified that the interest amount, computed at 2% of the reproduction cost, was estimated by them to be about $37,000, which they allowed in their appraisement of the property. There is no dispute about the reasonableness of the rate of interest applied, nor the correctness of the computation made by these witnesses of experience. Yet the Commission rejected this undisputed testimony of the witnesses by eliminating $16,814 of the interest sum. Interest during construction must be allowed

and included in any rate base computation under the reproduction cost new theory. Ohio Utilities Co. v. Public Utilities Commission of Ohio, 267 U. S. 359, 45 S. Ct. 259, 69 L. Ed. 656; Kings County Lightning Co. v. Prendergast et al., D. C., 7 F.2d 192; Wisconsin Telephone Co. v. Public Service Commission, 232 Wis. 274, 287 N. W. 122, 593. If that interest is proper, there can be no legal reason for allowing only a third of the correct sum.

 A fair rate of return, on a fairly established rate base, supplies the correct test of reasonableness which is the ultimate issue. There can be no fairly established rate base if the only evidence on the subject is rejected, or if facts and circumstances not established by the evidence are considered. Such procedure is arbitrary and offends the constitutional guaranty of due process.

The judgment of the Circuit Court is reversed and the proceeding remanded to the Commission with direction to promptly approve a schedule of telephone exchange rates for the Sioux Falls exchange that will afford an opportunity to earn a fair rate of return on the fair value of its exchange property devoted to public service. No costs to be taxed.

RUDOLPH, P.J., and POLLEY, ROBERTS, and WARREN, JJ., concur.

DENU, Circuit Judge, sitting in lieu of SMITH, J., disqualified.