# In Re NORTHWESTERN BELL TELEPHONE COMPANY
## (43 N. W.2d 553)

(File Nos. 9161, 9169. Opinion filed July 10, 1950)

**Sigurd Anderson,** Atty. Gen., **William Williamson,** Asst. Atty. Gen., and General Counsel for Public Utilities Commission, for Appellant in No. 9161.

**Joseph Robbie, Jr., Donald Fellows,** Mitchell, for Appellants in No. 9169, Farmers Union Educational and Cooperative Ass'n. of South Dakota and Junior Chamber of Commerce of Mitchell.

**H. A. Poley,** Omaha, Neb., **H. G. Burke,** Omaha, Neb., **F. G. Warren,** Sioux Falls, **R. F. Williamson** Aberdeen, **T. J. Peycke,** Omaha, Neb., of counsel, for Respondent Northwestern Bell Telephone Co.

PER CURIAM. In November, 1947, the Northwestern Bell Telephone Company made application to the Public Utilities Commission to increase rates for telephone exchange and intrastate toll service claiming that the rates then in effect were confiscatory and unlawful. The Company filed with its application a proposed schedule of increased rates. Presentation of testimony began on March 15, 1948, hearings were continued from time to time and on October 8, 1949, the Commission filed its report and made and entered its order denying the application. The Company appealed from such order to the Circuit Court of Charles Mix County. An order permitting the Company to place in effect increased rates pending appeal was annulled in an original proceeding in certiorari to review the validity of the order. Farmers' Educational and Coop. Union v. Circuit Court of Charles Mix County, 73 S.D.—, 40 N.W.2d 402. On March 9, 1950, the decision and judgment of the Circuit Court was entered setting aside the Commission's order and remanding the proceeding with directions to approve a schedule of exchange and intrastate toll rates that will permit a fair rate of return. The Commission and intervenors have appealed.

The Northwestern Bell Telephone Company, to which we herein refer to as the Company, is incorporated under the laws of the state of Iowa and operates a telephone system in the states of South Dakota, North Dakota, Iowa, Minnesota and Nebraska. The American Telephone & Telegraph Company, a New York corporation and hereinafter referred to as the American Company, owns the common

stock of respondent company and practically all the common stock of the Western Electric Company. The latter company and the American Company own all the stock in Bell Laboratories.

The Company renders in this state three classes of service: (a) exchange or local service; (b) intrastate toll service; and (c) interstate toll service. The books of the Company indicate that on September 30, 1948, the total cost of plant and equipment in this state was $23,214,027 and of this amount $18,054,312 was devoted to intrastate use. The court found that the evidence is insufficient to show that an account known as "Telephone Acquisition Adjustment", amounting to $451,389, constitutes a book cost to be considered in determining the rate base and should be deducted from the total book cost of intrastate property. The court found that the depreciation reserve account applicable to intrastate business as of September 30, 1948, was $5,341,-579 and that on this basis $13,189,336 was the minimum rate base upon which the company was entitled to earn a reasonable rate of return. The court disapproved the Commission's reductions of the following amounts: (1) $401,293 for metallicizing rural lines, (2) $55,483 as excess pension accruals and (3) $428,427 as alleged excess profits received by the Western Electric in its transactions with respondent company.

The Court found that the total intrastate revenue of the Company for the first nine months of 1948 was $4,001,-001, which annualized amounted to $5,334,668; that the total intrastate expenses for those respective periods were $4,020,814 and $5,361,084; and that intrastate operations of the Company for the first nine months of the year resulted in a loss of $19,813, which annualized amounted to $26,416. The Commission found that the total intrastate revenue for 1948 was $5,427,617. The difference of $92,949 between the Court's and the Commission's totals results from the methods of annualizing revenue. The Company submitted evidence of gross revenue for the first nine months of 1948. The Commission basing its estimate on the year previous added the above amount to cover increased revenue for the last quarter of 1948.

The findings of the Court indicate that 77.77 per cent of the Company's property in this state was in 1948 devoted to intrastate use and that 80.2 per cent of total expenses resulted from intrastate operations. The Commission used the 77.77 per cent as a basis in allocating expenses to intrastate operations. The court found that the allocation should have been made upon the basis of 80.2 per cent. This resulted in a difference of $124,543. The Commission held that $392,567 was the amount of depreciation expense properly chargeable for 1948, while the Court found that $665,469 was chargeable. The Court disapproved of the Commission's deduction of $80,000 from claimed expenses for 1948 on account of alleged deferred maintenance. The Court found that a deduction from claimed expenses of the Company in the amount of $85,573 because of alleged unreasonable profits found to have been made by Western Electric in its transactions with the Company was without support in the evidence. The Commission held that payments made to the American Company during the year 1948 under a so-called license contract were not chargeable to exchange and intrastate expenses. The Court found that there was no basis in the record for such action. The Court also disapproved of the Commission's finding to the effect that accruals in excess of the amount required for pensions on a "pay-as-you-go" basis for 1948 was not chargeable to expenses for that year. The Court found that if the requested rate increases had been applicable in the year 1948, the net income of the Company would have been $601,416 and that this would have resulted in a net return of 4.56 per cent.

■ ■ The authority to investigate and regulate intrastate telephone rates is vested in the Public Utilities Commission. SDC 52.02. The fixing of rates is inherently a legislative act whether performed directly by the legislature or by an administrative body to which the power is delegated. Farmers' Educational and Coop. Un. v. Circuit Court, supra, A fundamental principle of rate making is that a utility is entitled to rates that will yield a fair return on the reasonable value of the property devoted to public service after paying operating expenses and carrying charges. Rates not

sufficient to yield such return are unreasonable and confiscatory. The scope of judicial review of the issue of confiscation was considered by this court in Application of Northwestern Bell Telephone Co., 69 S.D. 36, 6 N.W.2d 165, 170. Judge Denu speaking for the court said:

"The State Constitution (Art. VI, §§ 2 and 13) and the United States Constitution (Amendments V and XIV) provide alike that no person shall be deprived of life, liberty or property without due process of law, and that private property shall not be taken without just compensation.

"These constitutional provisions have been many times applied by the courts in public utility cases in which it was sought to fix rates. Perhaps the strongest and the best language of its application is found in the opinion of Chief Justice Hughes in St. Joseph Stock Yards Co. v. United States, [298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033]. The opinion says: 'The fixing of rates is a legislative act. In determining the scope of judicial review of that act, there is a distinction between action within the sphere of legislative authority and action which transcends the limits of legislative power. Exercising its rate-making authority, the Legislature has a broad discretion. It may exercise that authority directly, or through the agency it creates or appoints to act for that purpose in accordance with appropriate standards. The court does not sit as a board of revision to substitute its judgment for that of the Legislature or its agents as to matters within the province of either. * * * When the Legislature itself acts within the broad field of legislative discretion, its determinations are conclusive. When the Legislature appoints an agent to act within that sphere of legislative authority, it may endow the agent with power to make findings of fact which are conclusive, provided the requirements of due process which are specially applicable to such an agency are met, as in according a fair hearing and acting upon evidence and not arbitrarily. * * *

" 'But the Constitution fixes limits to the rate-making power by prohibiting the deprivation of property without due process of law or the taking of private property for public use without just compensation. When the Legislature acts directly, its action is subject to judicial scrutiny

and determination in order to prevent the transgression of these limits of power. The Legislature cannot preclude that scrutiny or determination by any declaration or legislative finding. Legislative declaration or finding is necessarily subject to independent judicial review upon the facts and the law by courts of competent jurisdiction to the end that the Constitution as the supreme law of the land may be maintained. Nor can the Legislature escape the constitutional limitation by authorizing its agent to make findings that the agent has kept within that limitation. Legislative agencies, with varying qualifications, work in a field peculiarly exposed to political demands. Some may be expert and impartial. Others subservient. It is not difficult for them to observe the requirements of law in giving a hearing and receiving evidence. But to say that their findings of fact may be made conclusive where constitutional rights of liberty and property are involved, although the evidence clearly establishes that the findings are wrong and constitutional rights have been invaded, is to place those rights at the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards. That prospect, with our multiplication of administrative agencies, is not one to be lightly regarded.'

"Confiscation is merely the taking of private property without just compensation, and offends the Constitution. If the property itself is taken by eminent domain, just compensation is its value at the time of taking. If the legislature, either by its own act or through the creation of an administrative agency, prescribes rates or charges for a public utility, the use of the property is taken, and just compensation is a reasonable rate of return upon the value of the property at the time it is being used for the public service. In other words, a utility is entitled to rates that will yield a reasonable rate of return after payment of operating expenses, taxes and financial charges, for the use of the property devoted to public service. Anything less than that is unfair and unreasonable. West v. Chesapeake & Potomac Telephone Co. of Baltimore, 295 U.S. 662, 55 S. Ct. 894, 79 L.Ed. 1640; Board of Public Utility Commissioners v. New York Telephone Co., 271 U.S. 23, 46 S.Ct. 363,

70 L.Ed. 808; Baltimore & Ohio R. Co. v. United States, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209."

■ What was said in Application of Dakota Transportation, Inc., of Sioux Falls, 67 S.D. 221, 291 N.W. 589, and cases cited with respect to the scope of judicial review of orders and determinations of the Commission has no application where constitutional rights respecting rates are involved. The requirements of due process are ordinarily met by acting upon evidence and not arbitrarily. Where confiscation is claimed, due process requires judicial determination as to both law and facts.

It will be observed that the difference between the Court's and the Commission's findings as to the fair value of the Company's property used in intrastate business and computation of net revenue in the same business relate to (1) separation of interstate and intrastate expenses; (2) transactions arising out of the relation of the Company to the Western Electric and to the American Company; (3) annual allowances for depreciation and deferred maintenance; (4) actual plan of paying pensions; and (5) cost of metallicizing rural telephone lines and classifying same as investment.

Separations.

We first consider the question of the allocation of expenses to intrastate and interstate operations. It is conceded that accounting entries were made by the Company in accord with the system of accounts prescribed by the Federal Communications Commission. Regulatory jurisdiction over telephone companies was transferred from the Interstate Commerce Commission to the Federal Communications Commission by Act of Congress of June 19, 1934, 48 Stat. 1064, 47 U.S.C.A. § 151 et seq. Section 220(a) provides: "The Commission may, in its discretion, prescribe the forms of any and all accounts, records, and memoranda to be kept by carriers subject to this chapter, including the accounts, records, and memoranda of the movement of traffic, as well as of the receipts and expenditures of moneys." Section 220(g) provides that "it shall be unlawful for such person to keep any other accounts, records, or memoranda than those so prescribed or such as may be approved by

the Commission or to keep the accounts in any other manner than that prescribed or approved by the Commission."

■ ■ The appellant commission in its report said: "According to Exhibit A-93, the company has assigned to intrastate operations expenses $4,020,814, which is 80.2% of the total expenses for the nine months period. In the maintenance expense the percentage assigned to intrastate is even larger, although the plant maintained is assigned at only 77.77% to South Dakota intrastate operations. * * * We think such an allocation is unjust. Instead we think that the amount of such expenses upon the proportions set up by the company for the separation of the value of plant and equipment should be followed. * * * And it would seem to us that such a procedure which we propose to follow would also meet the test of the rule laid down in the case of Smith v. Illinois Bell Telephone Co., 282 U.S. 133, 51 S. Ct. 65, 68, 75 L.Ed. 255." In the case cited, the Supreme Court pointed out that separation of intrastate and interstate property, revenues and expenses "is essential to the appropriate recognition of the competent governmental authority in each field of regulation." A state commission is not deprived of power to fix rates for intrastate telephone service and is not bound by regulations prescribed by the Federal Communications Commission. See Northwestern Bell Tel. Co. v. Nebraska State Railway Commission, 297 U.S. 471, 56 S.Ct. 536, 80 L.Ed. 810. The expenses attributable to intrastate operations may not, however, be arbitrarily fixed. As has been pointed out 77.77 per cent of the Company's property in this state was devoted to intrastate use. It may not be assumed, without findings based upon evidence, that such percentage is also the proper basis for allocating operating expenses. From what has been said it follows that the findings of the Court below with respect to the allocation of expenses must be sustained.

### Western Electric.

Complaint was made before the Commission that profits made by Western Electric on goods sold the Company were excessive. The Commission determined that such profits were excessive and disallowed all such profits by making deductions from the rate base and from operating

expense. The trial court determined that the disallowance of these profits as determined by the Commission was arbitrary and based upon no substantial evidence. We concur in the view of the trial court.

The trial court made a studied statement of this Western Electric issue, which we quote in part:

"As hereinbefore noted, the American Company owns practically all of the stock of Western Electric Company, and under the rule announced in Smith v. Illinois Bell Telephone Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255, it was necessary for appellant to show not only that the prices charged by Western Electric to appellant were reasonable by comparison with the prices of other suppliers but also that the profits of Western Electric upon its sales to appellant have been reasonable. This same situation has existed in other telephone rate cases which have been before the Commissions and Courts of the United States. The Western Electric Company is in fact the manufacturing department of the American Company, and the American Company owns a great many operating companies, including appellant, so that the identical question, based upon supposedly substantially the same evidence, has been before the Courts. Mr. Burton R. Young, who is chief statistician of the Western Electric Company, who has been in its employ in its accounting and statistical department for nearly 30 years, testified at length. The American Company first acquired stock in Western Electric Company in 1918 when it purchased 40 percent of the stock then outstanding and this holding has been increased until at the present time 99.8 percent of the stock of Western Electric is owned by the American Company. The Western Electric is engaged chiefly in the manufacture of telephone apparatus, switchboards, cables, wires, etc., used by operating telephone companies. It has many manufacturing plants at various places in the United States, including one at St. Paul, Minnesota, one at Duluth, Minnesota, and one at Lincoln, Nebraska; it has 29 distributing houses located in the principal cities throughout the United States from which the manufactured products are distributed to the operating telephone companies and it also acts as purchaser of supplies which it

does not manufacture, which are sold and furnished to operating companies, including appellant. The apparatus and equipment manufactured by Western Electric is standardized, produced in large quantities and is sold to operating telephone companies at less than the cost when purchased from other manufacturers, and it appears to be entirely undisputed in this case as well as in other cases before the Courts that this arrangement is very advantageous to the operating companies, including this appellant. Western Electric Company also has developed standardized methods of repairing telephone equipment and taking over from operating companies their wornout parts and materials. The Western Electric Company has entered into a contract with appellant which enables appellant to buy materials, supplies, etc. through it at reduced prices, but does not obligate appellant to purchase from Western Electric Company. Appellant's Exhibit A-36 shows Western Electric Company's earnings available for interest and dividends related to net investment year by year for the period from 1916 through 1946 inclusive and shows its average percent of return on net investment through those years to be 6.6 percent. During some depression and war years, including 1932, 1933, 1934, and 1944 and 1945, Western Electric Company operated at a loss. Exhibit No. A-40 shows that for the period from 1925 to 1946 inclusive its average return on net investment was 6.9 percent and that the average return on net investment of 50 leading manufacturing corporations in the United States for the same period was 9.41 percent. Exhibit A-59 shows the return on net investment for the 50 largest manufacturing corporations in the United States between the years 1925 to 1947 inclusive. The average for the Western Electric Company was 6.98 percent, while for the others it was 8.72 percent.

"The annual reports of Western Electric Company for 1939 to 1948, both inclusive, being Exhibits A-125 to A-134 both inclusive, disclose that except during the war years the great bulk of Western Electric business was with the Bell telephone companies, but that during the war years the great bulk of its business was with the United States Government. Exhibit A-57 shows the total sales of the

company, together with the percentage of net profits to sales and the total sales to Bell customers with percentage of net profits to sales for the years 1916 to 1947, both inclusive.

"These figures disclose that there were no unreasonable earnings by Western Electric and further show that the earnings from sales to Bell telephone operating companies and appellant were not materially greater than profits on sales to non-Bell customers. There is no competent evidence which negatives these matters."

The Commission in its report acknowledged that its figures with reference to Western Electric were "approximations" only.

We agree with the views of the dissenting Commissioner. He stated with reference to the Commission's finding on excessive profits by Western Electric, "The reasoning by which this is arrived at is interesting but too devious to be analyzed here. * * * It is not contended by Special Counsel or Protestants that these figures are other than approximations. No such figures appear in the evidence and the manner in which they have been arrived at is based on assumptions and calculations which make them little better than guess work."

License Contract with the American
Telephone and Telegraph Company.

We approve the following opinion of the trial court on this issue:

"As hereinbefore set forth one of the deductions from expenses paid by appellant in arriving at the expense of operation for the year, 1948, was the amount paid to the American Company under the so-called license contract amounting to $50,454. This license contract was quite fully described in the evidence and is a contract similar or identical between the American Company and the operating companies of the Bell system. This contract called for a payment by appellant to the American Company during the year, 1947, and the first nine months of 1948 of a flat one and one-half percentage of its gross receipts. On October 1, 1948 this required payment was reduced to one percent of gross receipts.

"Mr. W. R. Johnson, the vice-president and general manager of appellant, testified at some length on the nature and value of the license contract services rendered by the American Company. The contract itself was received in evidence. Mr. Johnson testified that the services furnished have a continuing effect upon the telephone business which is extremely valuable to the Company. He said in part:

" 'To provide a high quality nation-wide telephone service requires continued scientific advancement in the art, coordination of and uniformity of operation, standardization of equipment, employment and training practices, methods and procedures and of equipment essential to the best overall results. This can best be accomplished at the lowest cost by the license contract arrangement whereby a specialized central organization performs such services for all of the associated companies and the Long Lines Department of the A. T. & T. Company. Without the benefit of the nation's best scientific discoveries and the procedures necessary to determine the application of them, the best known practices for training personnel, and the most efficient methods of operation, telephone users will be denied the advantages which they have a right to expect. These advantages may be either in more economical operation or in improved service or both. * * * The application of scientific discoveries and the continuously improved methods—has made our nation's telephone service outstanding and a world leader.'

"As hereinbefore noted, the American Company and the Western Electric Company own the Bell Laboratories, which is constantly engaged in extensive research, and under this license contract appellant is licensed to use and purchase from Western Electric all new and patented telephone devices. The American Company, Western Electric and Bell Laboratories do many things centrally for the operating companies; under it, the Company has a right to use and does use in its daily operations telephone devices, equipments, methods and systems covered by thousands of patents owned by the American Company and has the services of the American Company in operating and engineering patent protection, accounting and financing. He also testi-

fied that it would have been impossible to finance the extensive improvement of service to meet the public demand in South Dakota without the financial assistance provided for in the license contract. Mr. Johnson also testified that the appellant's organization is not staffed or equipped to do the necessary work done by the American Company and that if these license contract services were not available, the Company would not know where to get the competent scientists in additional number to do the research now being done, and that he was unable to estimate how many additional employees the company would require in attempting to independently furnish the service for itself. It would serve no useful purpose to discuss this evidence in further detail. Reference to the service will be contained in quotations from other Courts which have passed upon the matter.

"Mr. H. C. Gretz, assistant comptroller of the American Company, testified as to the cost to the American Company in rendering the services provided for in the contract. He explained how the financing arrangement between the American Company and appellant permitted appellant to avoid having relatively large amounts of idle capital in its capital structure which it otherwise would have to have if it was forced to finance itself entirely by independent bond or capital stock issues upon which it would incur capital costs before the capital was translated into earning telephone plant. He also introduced several exhibits showing among other things the payments received by the American from appellant during the year 1946, and that the cost of furnishing license contract services applicable to South Dakota exceeded its payments for that year by the sum of $21,999 after federal income taxes and $5,823 before federal income taxes. He also showed that for the years, 1944 to 1946, the license contract cost applicable to South Dakota exceeded payments received for that service and that in 1947 the American Company's cost of rendering the service allocable to South Dakota exceeded its payment in the amount of $2,155 after federal income taxes. As hereinbefore stated, the rate of payment was reduced on October 1, 1948 to one percent. The exact figures for the cost of the services under the contract to American Company for 1948 were not available at the time of the hearings.

"It is undisputed that this item of expense was actually paid by appellant to the American Company. It was the position of the Commission in disallowing this expense in its entirety that the evidence introduced by appellant before the Commission, although entirely undisputed, was insufficient to establish both the value of the service to appellant and to negative the making of excess profit by the American Company as required by the rule announced by the Supreme Court in Smith v. Illinois Bell Telephone Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255.

"Almost from the inception of the telephone business in this country, contracts of this kind have been in existence and transactions under the license contract between the American Company and the Bell operating companies have been before the Courts on many occasions. In the earlier cases the only legitimate inquiry was considered to be whether the operating company was getting value received. * * * City of Houston v. Southwestern Bell Co., 259 U.S. 318, 42 S.Ct. 486, 66 L.Ed. 961; * * * State of Missouri ex rel. Southern Bell Telephone Co. v. Missouri Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981, 31 A.L.R. 807; * * * State ex rel. Hopkins v. Southwestern Bell Telephone Co., 115 Kan. 236, 223 P. 771, 781, * * *.

"In Smith v. Illinois Bell Telephone Co., supra, the Court went further and held that the cost to the American Company of rendering the license services were proper matters of inquiry. The Court said:

" 'In view of the findings, both of the state commissions and of the court, we see no reason to doubt that valuable services were rendered by the American Company, but there should be specific findings by the statutory court with regard to the cost of these services to the American Company and the reasonable amount which should be allocated in this respect to the operating expenses of the intrastate business of the Illinois Company in the years covered by the decree.' " [282 U.S. 133, 51 S.Ct. 72.]

"In the present case, the Commission considered the evidence insufficient because the expense was 'allocated' to South Dakota. From the very nature of the services rendered it must be apparent that it is impossible to exactly fix

the value of each item of the services rendered, but the method used in this case clearly satisfies the requirements of the case of Smith v. Illinois Bell Telephone Co., supra. In the very recent case of Southern Bell Telephone & Telegraph Co. v. Public Service Commission of Georgia, 203 Ga. 832, 49 S.E.2d 38, 63, the Supreme Court of Georgia said:

" 'The first item in this class is $360,765 annually paid to the American Telephone & Telegraph Company under a contract for services furnished the Bell Company at a cost of 1½ per cent of its gross receipts. The undisputed evidence shows that the petitioner obtained substantial benefits under this contract. It shows that the company realizes benefits amounting to many times the amount of this expenditure as a result of and in virtue of this contract. The evidence demanded a finding as was held by the trial court, that this was a legitimate and proper expenditure, and that it must be considered in computing rates. Such expenditures have been held to be proper expenses. State of Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission of Missouri, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981, 31 A.L.R. 807 (1923, Bulletin No. 1812); State ex rel. Hopkins v. Southwestern Bell Telephone Co., 115 Kan. 236, 223 P. 771 (Kansas) (1924, Bulletin No. 2021); State ex rel. Pacific Tel. & Tel. Co. v. Department of Public Service, 19 Wash.2d 200, 142 P.2d 498 (Washington) (1943). Our ruling on this item alone shows a case of confiscation in the amount of this item.' ".

"To the same effect see Alabama Public Service Commission v. Southern Bell Tel. & Tel. Co., Ala.Sup., 42 So.2d 655. Southern Bell T. and T. Co. Tennessee Railroad and Public Utilities Commission, Decision of [Tenn.] Supreme Court dated April 30, 1949.[1]

"The disallowance of the amount paid as disclosed by the evidence in this case was, in view of the evidence submitted, unjustified and arbitrary and not supported by the evidence."

Depreciation.

We are called upon to determine whether the Company has met the burden required of it in establishing by suf-

---

[1] Not designated for publication.

ficient, competent evidence the propriety of its claimed depreciation on depreciable telephone plant for the year 1948.

Resorting to figures bearing but slight significance in the event a true appraisal of the Company's depreciation reserve account should be undertaken, and arguing that these figures support the supposition or assumption "that the depreciation reserve balance has been increasing steadily in the last few years far in excess of any withdrawals that could reasonably be expected in the foreseeable future", the Commission came to the conclusion "that this excessive accumulation in this fund must be reduced". The historical data, facts and figures reflecting upon this account were not before the Commission and we are not in this proceeding invited to pass upon the correctness or validity of the Company's depreciation reserve built up during years of service of the utility in this state prior to 1948. Nor are we asked to approve or disapprove what is known as the "straight line" method of determing the amount of depreciation chargeable as annual expense. Respecting this method the report of the Commission, among other things, state;

"The applicant figures its depreciation by the so-called straight line method, which is prescribed by the Federal Communications Commission, and has been generally accepted by this Commission. This method is designed to spread evenly over the service life of the property the loss which is realized when the property is ultimately retired from service."

It should be borne in mind also that the accumulated depreciation reserve was deducted from book cost in determining the net investment rate base.

Relying almost exclusively upon the testimony of the witness Quinney and the decision in the case of Lindheimer v. Illinois Bell Telephone Co., 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182, the Commission decided that it should reject the proof offered by the Company and should determine the proper amount of depreciation chargeable as expense in 1948. In adopting the calculations of said witness the Commission concluded that the depreciation expense claimed by the Company for that year was excessive and should be re-

duced to $392,569. As hereinbefore stated, the trial court found that the sum of $665,469 was properly chargeable as the 1948 depreciation expense. This latter sum is in accord with the proof and calculations on the part of the Company.

Worthy of more than casual attention are the facts that in recent years, and particularly since December, 1946, and the granting of the last rate increase, many new subscribers, large numbers of whom are in rural areas, have been added to the lines and services of the Company and that capital investment and annual depreciation have moved to levels related to the expanded services. Respecting these and other factors which have had our consideration is finding number II of the trial court as follows:

"That the present exchange and intrastate toll rates became effective in January, 1947; that since that time the Appellant's investment has greatly increased and that in order to satisfy demands for service the net additions to plant for the years 1948 to 1952 will be about $7,000,000 more. That when the present rates became effective they were estimated to earn a return of less than 3½ per cent on Appellant's investment, but that prices for materials, supplies, and labor have greatly increased and that Appellant [Company] operated at a loss during 1948."

With the exception of the final recitation that the Company operated at a loss during 1948, the facts determined by said finding are altogether undisputed.

What we have said regarding the issue here for review and the proof before the Commission on that issue, and the disposition thereof by both the Commission and the Court, is deemed wholly sufficient to distinguish this from the proceeding reviewed by the decision in the Lindheimer case, supra. We are not here asked to decide that the Company credited too much or too little to the depreciation reserve account for 1945 or for some other year or years and, if too much, then to disallow a part of the depreciation expense for 1948 in order to reduce what may now be looked upon, by more or less of a guess, as an excessive depreciation reserve.

We turn then to the question of the 1948 depreciation expense. In lieu of an extended discussion of the testimony

and exhibits placed before the Commission we here set forth the decision of the learned trial court, reviewing the record evidence, as follows:

"As hereinbefore pointed out, appellant is required to keep its accounts, records and memoranda in the manner prescribed by Federal Communications Commission as set forth in Exhibit A-2 and it is unlawful for appellant to keep any other books or memoranda except as so prescribed. (See page 14 of this memo.)

"These rules cover the matter of depreciation and provide what classes of telephone plant are depreciable. On page 5 of Exhibit A-2 we find:

" ' "Depreciation," as applied to depreciable telephone plant, means the loss in service value (note paragraph (dd) of this section) not restored by current maintenance, incurred in connection with the consumption or prospective retirement of telephone plant in the course of service from causes which are known to be in current operation, against which the company is not protected by insurance, and the effect of which can be forecast with a reasonable approach to accuracy. Among the causes to be given consideration are wear and tear, decay, action of the elements, inadequacy, obsolescence, changes in the art, changes in demand and requirements of public authorities.

" '(dd) "Service value" means the difference between the original cost and:

" '(1) The salvage value (note paragraph (bb) of this section) for station apparatus.

" '(2) The net salvage value (note paragraph (t) of this section) for other telephone plant.'

"These rules further provide that depreciation charges shall be computed by applying the composite annual percentage rates considered applicable to the original cost of each class of depreciable telephone plant owned or used by the company, and further provides:

" 'These percentage rates shall be based upon the estimated service values and service lives developed by a study of the company's history and experience and such engineering and other information as may be available with respect to prospective future conditions. These percentage

rates shall be computed in conformity with the group plan accounting for depreciation and shall be such that the loss in service value of the property except for losses excluded under the definition of depreciation may be distributed under the straight-line method (note Sec. 31.01-3 (ff) during the service life of the property.'

"Under these rules the company is also required to keep such records of property and property retirements as will reflect the service life of the property that has been retired or will permit the determination of service life indications by mortality, turn over, or other appropriate methods, and also such records as will reflect the percentage of salvage value, or net salvage value, as appropriate, for property retired from each class of depreciable telephone plant.

· "It will thus be seen that the Company is not only required to make its own studies upon which to base its depreciation, but is required to keep records, open to the F.C.C. and State Commissions at all times, from which such commissions may make or cause to be made, their own studies to test the accuracy of the studies made by the company upon which depreciation charges are based.

"That appellant has faithfully kept its records and made its studies in strict compliance with the requirements of these federal rules is not disputed by any substantial evidence. The depreciation rates for 1948 as determined by appellant are set forth in Exhibit A-98, and the application of such rates resulted in depreciation expense for 1948 of $665,469 as disclosed by Exhibit A-93.

"Exhibit A-92 shows the grand total book cost of plant and equipment as of September 30, 1948 to be $23,214,027. This exhibit shows the classes of telephone property making up the total. This total includes the Telephone Plant Acquisition Adjustment account, amounting to $580,415, the intrastate portion of which was deducted from the book cost by the Commission and which deduction has been hereinbefore discussed and approved.

"Mr. E. H. Quinney, an engineer employed by the Commission, first testified at the August, 1948, hearing. He was employed as engineer for the Commission from 1941 until February, 1946, and from then until June, 1948, by the

Game, Fish and Parks Department of South Dakota. He presented Exhibit P-90 which he had prepared from annual reports of appellant to Federal Communication Commission covering the five states in which appellant operates, for the years 1933 to 1947. Errors having been called to Mr. Quinney's attention, he at the December hearings filed a revised Exhibit P. 90, but this contained errors which distorted his computations. As was pointed out in appellant's brief filed with the Commission, Mr. Quinney treated station apparatus on a capital life basis in computing the composite average service life of the property, while in computing the composite net retirement loss he treated station apparatus throughout the period of 1933 to 1947, inclusive, on the location life basis. Also, although he treated each class of plant separately in computing his composite average service life which was proper he lumped the retirement and salvage experience of all classes of plant together for each year of the period.

"In the dissenting report is set forth a memoranda prepared by William Williamson, attorney for the Commission, which sets forth the erroneous results reached by Mr. Quinney. This is set forth in the published reports of the Commission. Mr. Williamson arrives at the conclusion that the average composite depreciation rate for 1948 is 4.1778% but that this is based upon appellant's actual retirement experience by classes of plant for the fifteen year period, 1933 to 1947.

"As hereinbefore noted the studies made by Mr. Quinney were only for the fifteen year period and the results reached were erroneous."

 The major issue being confiscation, it became the duty of the Court to determine the validity of the action of the Commission in rejecting the proven claim of the Company for the 1948 expense due to depreciation and substituting a figure for that expense calculated to reduce the depreciation reserve, all of which reserve, with the approval of the Commission, was excluded from the rate base. The effect of the ruling of the Commission is to transform expense into income in reaching a decision that the rate of return was fair and not confiscatory. Arguments of counsel

have failed to convince us that the Court has misjudged this item. We think the record is such as to require our affirmance of the ruling upholding the depreciation expense as claimed.

### Deferred Maintenance.

■ The Commission deducted $80,000 from the 1948 expense of the company because of alleged deferred maintenance. The trial court held this deduction was contrary to the evidence. We agree with the trial court.

The only basis for the deduction is found in Exhibit A-77 which shows the maintenance charges for the years 1939 to 1947. The maintenance charges increased from year to year, with a large increase in 1946 and 1947. But the evidence is undisputed that throughout the years prior to 1946 the company maintained its plant in excellent condition. The increase in 1946 was explained by the Company as reflecting the higher cost of labor, vehicles, tools and machinery, and an expansion of plant causing rearrangements and changes not chargeable to new construction, and causing increased maintenance costs. Other matters are testified to in great detail explaining the greater maintenance expense· commencing in 1946. There is no support in the record for the deduction made by the Commission. We concur in the statement of the trial court that the result reached by the Commission "is pure speculation based on no evidence." There is nothing in the record to indicate other than that the present level of maintenance expense will continue in the foreseeable future.

### Pensions.

■ As above indicated, the Commission disallowed pension accruals as a proper expense of the Company's intrastate business and in effect rejected the latter's pension plan converted in more recent years from a pay-as-you-go to a system based upon actuarial calculations. In discussing and criticizing the transition to the plan now in effect the Commission states the issue as follows:

"Therefore, the only question before the Commission is whether the company is accuring (sic) for its pension reserve amounts in excess of those necessary to pay present pensions."

It is, of course, clearly established that for the present, and during a period of some years to follows, accruals required annually, in order to effectuate the financial structure with which to support withdrawals as super-annuations are to be met in the future, are in excess of pensions now payable annually. Consequently, the only question is whether the present pension plan is sound and not an unfair burden to those who pay for the use of telephones. From the court's review of the plan we quote in part as follows:

"In 1927 the Interstate Commerce Commission, then regulating telephone companies, amended its system of accounts to permit advance accruals on an actuarial basis for pensions. Shortly thereafter, appellant took the first step toward the adoption of an adequate full-service accrual basis, finally completed in 1941. A pension trust fund was established into which it pays each year the amount deemed necessary to place the same upon a sound accrual basis. The money is paid over to a trustee and is immediately and permanently beyond the reach of appellant."

That these statements are not open to question is fully affirmed by the record before us. It is equally plain that the amount actually paid to the trustee for these pensions under the plan now in effect is not excessive.

Appellant's brief cites to us no reported decision wherein a court of last resort has disapproved the pension plan rejected by the Commission, and we too find no such authority. On the other hand, the same or similar plans are upheld as sound and not unduly burdensome to telephone users in the following cases: State v. Tri-State Telephone & Telegraph Co., 204 Minn. 516, 284 N.W. 294; Southern Bell Telephone & Telegraph Co., v. Georgia Public Service Commission, 203 Ga. 832, 49 S.E.2d 38; Alabama Public Service Commission v. Southern Bell Telephone & Telegraph Co., Ala. Sup., 42 So.2d 655; State ex rel. Pacific Telephone & Telegraph Co. v. Department of Public Service, 19 Wash.2d 200, 142 P.2d 498; Petition of New England Telephone & Telegraph Co., 115 Vt. 494, 66 A.2d 135. We are convinced that the action of the Commission with respect to the Company's accruals and payments in furtherance of the adopted pension plan cannot be sustained.

## Metallicizing.

In reaching its determination of the rate base the Commission refused to include the stated amount expended by the Company in metallicizing its rural lines. That such expenditures were and are necessary, and were in the interests of good service to telephone users, is fully conceded. The sole inquiry here is whether the Company is entitled to a fair return upon the cost of this investment.

In excluding this item of plant improvement the Commission points to the provisions of Ch. 108, S.L.1939. The act referred to but authorizes boards of county commissioners to grant the use of areas along public highways in the counties for the purpose of erecting and maintaining thereon lines conducting electricity. The grants thereby authorized are to be subject to stated conditions, the last of which is as follows:

"(5) Whenever the erection and maintenance of such electric lines shall interfere with the lines or service of any telephone company, the grantee shall furnish all necessary wire and attachments for making telephone lines metallic, where necessary, and such additional poles above the number in place as is necessary to carry the additional telephone equipment in accordance with standard practices, and shall pay the cost of any necessary moving of telephone lines."

It is observed that the quoted provisions do not include the cost of installing equipment made necessary by reason of interference to be encountered by the lines or service of the telephone company. We indulge the assumption that this item is something more than negligible in a half-million-dollar installation over many miles of county roadways.

We think it fairly deducible that the election of the Company to waive its rights under Ch. 108, S.L.1939, was a matter of business policy and was not an abuse of its managerial discretion in the premises. The disinclination of the Company to exact its pound of flesh and its desire to avoid an attitude of hindrance toward the program of rural electrification, with the attendant benefits of such a program flowing to vast numbers of telephone subscribers, furnish no plausible support for the view that this part of

the Company's property should be taken without just compensation.

Judgment affirmed.

MEDIN, Circuit Judge, sitting for SMITH, J., disqualified.

SICKEL, J. (dissenting). The question in this case is whether the previously existing intrastate rates, as increased by the commission on December 27, 1946, have become confiscatory. Matters to be considered are first, the value of the company's investment, second, its income and third, its operating expenses.

Depreciation is regarded as a legitimate item of expense. It is "the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy and obsolescence. * * * In determining reasonable rates for supplying public service, it is proper to include in the operating expenses, that is, in the cost of producing the service, an allowance for consumption of capital in order to maintain the integrity of the investment in the service rendered." Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 54 S.Ct. 658, 664, 78 L.Ed. 1182.

The "straight line" method for determining investment was used by the company in this case. "By this method the annual depreciation charge is obtained by dividing the estimated service value by the number of years of estimated service life. The method is designed to spread evenly over the service life of the property the loss which is realized when the property is ultimately retired from service. According to the principle of this accounting practice, the loss is computed upon the actual cost of the property as entered upon the books, less the expected salvage, and the amount charged each year is one year's pro rata share of the total amount." Lindheimer v. Illinois Bell Tel. Co., supra.

The amount of the depreciation is charged annually to expense. In common practice the corresponding entry is a credit to the capital or investment account, but that practice has not been followed by the company in this case. Instead it has credited the amount of depreciation to an account

designated as "Depreciation Reserve". "As the allowances for depreciation, credited to the depreciation reserve account, are charged to operating expenses, the depreciation reserve invested in the property thus represents at a given time, the amount of the investment which has been made out of the proceeds of telephone rates for the ostensible purpose of replacing capital consumed. If the predictions of service life were entirely accurate and retirements were made when and as these predictions were precisely fulfilled, the depreciation reserve would represent the consumption of capital, on a cost basis, according to the method which spreads that loss over the respective service periods. But if the amounts charged to operating expenses and credited to the account for depreciation reserve are excessive, to that extent subscribers for the telephone service are required to provide, in effect, capital contributions, not to make good losses incurred by the utility in the service rendered and thus to keep its investment unimpaired, but to secure additional plant and equipment upon which the utility expects a return." Lindheimer v. Illinois Bell Tel. Co., supra.

W. R. Johnson, the company's statistician, estified that "depreciation expense is the provision to meet the loss of investment when depreciable plant is retired from service. All the properties used in rendering telephone service will ultimatly be retired, either because it is worn out, has become inadequate, or because it must be replaced for other reasons, such as replacing aerial plant with underground plant. This is a cost of rendering telephone service * * *."

The company's witness Jensen testified that since 1933 they calculated the accruals for depreciation and recorded the charges to the reserve for South Dakota. They made the apportionment to South Dakota of the depreciation reserve as of December 31, 1933, of $1,234,845 (Exhibit A-7) added the net increase in the reserve from December 31, 1933, to December 31, 1947, of $2,925,933, also depreciation of Dakota Central Company applicable to South Dakota at time of merger on June 30, 1942 of $2,084,064 and depreciation reserve of general area office applicable to South Dakota on December 31, 1947, of $129,182. The total of this is $6,374,024 shown line 11, Exhibit A-7. Of this sum the intrastate share is $5,135,092.

Swancutt, the company's appraisal engineer, testified: "The depreciation reserve makes provision for the expected ultimate loss of capital resulting from future retirements due to inadequacy and obsolescence which have not yet occurred." He deducted $7,415,971 from the **current cost new.** "That represents an accrual for all kinds of depreciation including obsolescence, inadequacy, wear and tear that would have been made, **assuming this property to have been built at current cost levels** and the accrual rates for depreciation and purposes to have been as they were." He further testified that if there is any obsolescence or inadequacy in the present property, that would be taken into account by deduction of the entire amount of the depreciation reserve requirements.

The question is whether the method pursued by the company as outlined in the above testimony is the proper method of calculating the "allowance for the consumption of capital in order to maintain the integrity of the investment in the service rendered." Lindheimer v. Illinois Bell Tel., supra.

From the testimony of the witnesses, as above related, it appears that charges are made to expense and credits are made to the depreciation reserve, out of the proceeds of telephone rates, not only to represent the consumption of capital in the service rendered, on a cost basis, but also to replace worn out, obsolete and inadequate property with new and modern equipment sufficient to meet the needs of the company's expanding business, at "current cost new". The account has been used to provide for capital additions substantially in excess of accrued depreciation. The company has used the depreciation reserve account as "a means by which the public is compelled to loan the Company a substantial amount of money without interest, which the Company is privileged to invest in its plant, and on which the public will be required to pay the Company a fair return as well as additional depreciation annuities to compensate the Company on its retirement, and so ad infinitum." State v. Tri-State Telephone & Telegraph Co., 204 Minn. 516, 284 N.W. 294, 313.

The only legitimate purpose of the reserve is to equal-

ize expenditure so as to take from the revenue earned in each year its fair share of the burden. To the extent that the annual charges include amounts that will not be required for that purpose, the account misrepresents the cost of the service, and is excessive. There is no way to ascertain the amount of such excess from the record in this case. These charges amount to the exaction of "capital contributions, not to make good the losses incurred by the utility in the service rendered and thus to keep its investment unimpaired but to secure additional plant and equipment upon which the utility expects a return." Lindheimer v. Illinois Bell Tel. Co., supra.

By the company's own calculation the depreciation reserve applicable to intrastate business in South Dakota, amounting to $5,341,579, is still at least fifty per cent greater than the existing plant depreciation at this time, in spite of the fact that the value of the company's plant has almost doubled in the past ten years.

The company contends that it must maintain a large reserve to cover casualties, such as sleet storms. These casualties are properly chargeable to expense, payable out of the working capital fund. The experience of the company on these matters is shown by Exhibit A-77 stating the amount of casualty repairs in the State of South Dakota as follows: 1939, $534.00; 1940, $25,637.00; 1941, $36,089.00; 1942, $124,415.00; 1943, $32,091.00; 1944, $76,143.00; 1945, $3,940.00; 1946, $20,401.00; 1947, $9,695.00. There is nothing in the evidence to indicate that the working capital is likely to be inadequate to meet such expenses.

The present rates were established by competent authority in 1946 and were adequate at that time. The burden of proving them confiscatory is on the company. This burden does not shift to the commission simply because the books and records of the company are available to the commission and its examiners. In my opinion the company has failed to sustain its burden of proof in this case and that the decision of the Public Utilities Commission denying an increase in rates should be affirmed on the record as made.