US WEST COMMUNICATIONS, INC., Appellant,

v.

PUBLIC UTILITIES COMMISSION OF the STATE OF SOUTH DAKOTA, Appellee.

No. 17891.

Supreme Court of South Dakota.

Argued Oct. 5, 1992.

Decided Aug. 11, 1993.

William P. Heaston, Denver, CO, Thomas J. Welk of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for appellant.

Mark Barnett, Atty. Gen., Doug Eidahl, Rolayne Ailts, Public Utilities Com'n, Pierre, for appellee Public Utilities Com'n of State of SD.

Darla Pollman Rogers, Brian Meyer of Meyer & Rogers Onida, Benjamin H. Dickens, Jr. of Blooston, Mordkofsky, Jackson & Dickens, Washington, DC, for appellees South Dakota Network, Inc. and SDCEA.

FITZGERALD, Circuit Judge.

US West Communication (USWC) appeals from a circuit court judgment affirming in all respects the Public Utilities Commission's (PUC) findings of fact, conclusions of law and decisions in dockets F–3860, F–3866 and F–3699. We affirm, in part, reverse, in part, and remand.

## PROCEDURAL HISTORY

DOCKET NO. F–3860—IN THE MATTER OF THE APPLICATION OF SOUTH DAKOTA NETWORK, INC. AND SOUTH DAKOTA CENTRALIZED EQUAL ACCESS, INC. FOR PERMISSION TO CONSTRUCT CENTRALIZED EQUAL ACCESS FACILITIES.

The PUC received an application from South Dakota Network, Inc. (SDN) for permission to construct centralized equal access transport and switching facilities in the eastern third of South Dakota. The proposed facilities include access facilities operating within the service territory occupied and served by USWC.

The PUC issued an amended order granting SDN permission to construct the centralized equal access transport and switching facilities and ordering that SDN would have a monopoly over all switched access service originating or terminating in the SDN member exchanges. The PUC found that the construction and operation of the centralized equal access facilities was in the public interest because the facilities would provide modern state of the art telecommunications services and would encourage toll competition in the SDN member local exchange service areas. In addition, the construction and operation of the centralized equal access facilities would stimulate and preserve the small independent telephone companies in South Dakota. The PUC granted SDN a "short-term monopoly" on both originating and terminating access service in order to ensure that SDN would survive financially and prosper, with the goal that SDN would ultimately compete with USWC for interexchange access services without any monopoly protection.

Commissioner Schoenfelder dissented from the portion of the order mandating the originating and terminating access monopoly and preventing USWC from using its own facilities to transport its own traffic to the service boundaries of exchanges operated by SDN members. Commissioner Schoenfelder noted, that "to mandate that USWC not be allowed to use their existing facilities to terminate their own traffic will result in increased access rates for USWC customers, caused by stranded investment in part and in part by increased terminating access charges."

*DOCKET NO. F–3866*—IN THE MATTER OF THE APPLICATION OF BROOKINGS MUNICIPAL TELEPHONE, INTERSTATE TELECOMMUNICATIONS COOPERATIVE, INC., MCCOOK COOPERATIVE TELEPHONE COMPANY AND SIOUX VALLEY TELEPHONE COMPANY TO CONSTRUCT NON–COMPETITIVE TELECOMMUNICATIONS FACILITIES.

The PUC received an application from Brookings Municipal Telephone (Brookings), Interstate Telecommunications Cooperative, Inc. (ITC), McCook Cooperative Telephone Company (McCook), and Sioux Valley Telephone Company (Sioux Valley) for authorization to construct and operate their respective non-competitive fiber optic transport facilities that would cross territories already served by other telecommunications companies. The purpose of the facilities was to permit each of the joint applicants to connect their local exchange areas with meet points for the SDN centralized equal access system. All the facilities terminate in the service territory of USWC. USWC's petition to intervene was granted.

The PUC approved the construction of the McCook facility and granted Brookings and Sioux Valley (Lightwave) and ITC permission to carry intrastate traffic. Lightwave was granted a construction permit and PUC approval to carry interstate traffic in Docket No. F–3699. ITC was also granted a construction permit and approval to carry interstate traffic in Docket No. F–3822.

The PUC found that the proposed access transport lines were necessary to connect the local exchanges served by Brookings, ITC, McCook and Sioux Valley with the SDN's centralized equal access system. The connection would allow the local telephone exchanges to enjoy competitive long distance service and related benefits provided by the SDN centralized equal access system. The PUC granted a monopoly on all switched access traffic in order to be consistent with the decision in Docket No. F–3860.

Commissioner Schoenfelder dissented from the portion of the order that mandated the terminating access monopoly which prevented USWC from using its own facilities to transport USWC traffic to the local exchanges, stating "[c]onsistent with the intent of Senate Bill 42 [SDCL 49–31–20 and 21], terminating transport must be competitive to foster competition for access services."

*DOCKET NO. F–3699*—IN THE MATTER OF THE PROPOSED BROOKINGS TO SIOUX FALLS JOINT LIGHTWAVE TOLL FACILITY IN SOUTH DAKOTA.

The PUC was notified of Lightwave's proposal to construct and operate a fiber optic

telecommunications transmission facility from Brookings to Sioux Falls, South Dakota. The facility was intended to carry only interstate switched telecommunications traffic to the AT & T switch in Sioux Falls. In April 1989, the PUC determined that it had jurisdiction over the proposed facility but it did not determine whether the facility was in the public interest, because, in the PUC's view, the facility was a non-access facility. USWC and Lightwave appealed that decision with USWC objecting to the non-access finding and Lightwave challenging the PUC's jurisdiction. The circuit court affirmed the PUC's order. On appeal, this Court affirmed the PUC's jurisdiction but reversed the non-access determination and remanded the case to the PUC for the required public interest determination. *Northwestern Bell v. Public Util. Com'n*, 467 N.W.2d 468 (S.D.1991).

The PUC held a hearing on whether the construction of the Lightwave facility was in the public interest and issued an order granting the construction permit after finding that the construction was in the public interest. USWC appealed all three PUC decisions to the circuit court. The three appeals were consolidated by the circuit court and the court issued a judgment affirming, in all respects, the PUC's decision in Dockets F–3860, F–3866 and F–3699. USWC appeals.

## STATEMENT OF FACTS

*DOCKET NO. F–3860.*

SDN is composed of twelve member companies, each of which is engaged in the business of providing local exchange telephone service.[1] The twelve member companies of SDN serve seventy-six local telephone exchanges in eastern South Dakota. In addition to monopoly local exchange telephone service, each of the member companies furnishes switched access service [2] which allows long distance telephone companies to utilize the facilities of the local exchange company for the origination and termination of long distance calls.

SDN itself will not be in the business of providing local exchange telephone service. Rather, SDN's primary business activity will be to transport long distance telecommunications traffic to and from the seventy-six local exchanges operated by the SDN member companies to the SDN switching facility that will be constructed in Sioux Falls.

SDN's application, filed with the PUC, requests permission to construct centralized equal access facilities. Centralized equal access provides presubscription Feature Group D (FGD) [3] on a "1+" basis. Equal access will provide competition for toll services by allowing a customer to chose, by dialing the number "1" plus the ten or seven digit telephone number, the inter and intraLATA [4]

---

1. SDCL 49–31–1(5) defines "Local Exchange Service" as the access and transmission of two-way switched voice communications within a geographical territorial unit established by a telecommunications company for the administration of telecommunications services.

2. *"Access"* is the ability to enter or exit the local exchange network in order to originate or terminate an interexchange communication. End-user (EU) access is the ability to communicate with anyone else who has a telephone. Interexchange carrier (IXC) access is the ability to originate and terminate connections between local exchange carriers (LECs) and end offices (EO) so that the EU can make long distance calls.

 *"Switched access"* is the service that allows local customers to connect to long distance telephone companies. "Access charges" are charges assessed to the toll provider through which local exchange carriers are compensated for the use of network facilities.

3. *"Feature Group D"* (FGD)—Is the class of services associated with equal access arrangements.

All interexchange carriers enjoy identical connections to a local exchange carrier. All customers dial the same number of digits and can reach the predetermined interexchange carrier of their choice by dialing the "1" plus the telephone number being called. When equal access is implemented, all other feature groups (i.e., FGA, FGB, FGC) convert to FGD and the interexchange carrier is billed for actual measured use. In some cases, an interexchange carrier may desire to maintain FGA or FGB arrangements, but the FGD equal access rates will apply.

4. *LATA*—Local access and transport area. Proposed as part of guidelines to facilitate divestiture of BOCs (Bell Operating Companies) from AT & T. These areas will reflect common social and economic communities of INTRAs served by BOCs. They will not correspond necessarily with franchised exchange boundaries. The Federal Court, in breaking up the Bell System, approved the United States being divided into 184 LATA areas. A regional Bell Operating Company handles traffic within the LATA and turns over interLATA calls to an interLATA interex-

interexchange carrier[5], respectively, as the primary interexchange carrier of the customer's long distance telecommunications. However, as proposed, the equal access facility will only provide competition for toll services *after the call* reaches the SDN equal access switching tandem in Sioux Falls. Pursuant to the PUC's order, an originating and terminating monopoly was granted to SDN, which means that it is the sole provider from the seventy-six SDN exchanges to the access tandem in Sioux Falls and vice versa. Currently, equal access is unavailable in SDN's member exchanges. SDN would be the first telecommunications company to offer intraLATA, intrastate equal access.

The facilities would consist of a centralized equal access tandem switch, in Sioux Falls, operated by SDN's wholly owned subsidiary South Dakota Centralized Equal Access, Inc., (SDCEA) and additional plant consisting of fiber cable connecting the seventy-six member exchanges to the SDN owned switching facility. The tandem switch, located in Sioux Falls, is within the certified local exchange territory of USWC. This facility (speaking collectively of the tandem switch and fiber optic cable) would provide inter and intrastate and inter and intraLATA switched access telecommunications services between Sioux Falls and the seventy-six local exchanges of the twelve member telecommunications companies that own stock in SDN.

SDN's proposed fiber cable connecting the member exchanges to the SDN switching facility essentially duplicates USWC's already existing fiber facilities.[6] USWC currently uses the existing facilities to transport its own long distance telecommunications traffic to and from customers in the exchanges operated by SDN member companies. USWC also uses those same facilities to carry long distance traffic for other long distance companies to and from customers located in the SDN member exchanges.

USWC's existing facilities run to *each* of the seventy-six exchanges operated by the twelve member companies. At each exchange an access is made which allows a call being transported by USWC to be completed over the facilities of the local exchange company. However, as alluded to above, under the PUC's order, USWC will no longer be allowed to carry its own long distance traffic or the traffic of other long distance carriers over their facilities to each of those access connection points. Instead, USWC will be required to deliver all of its long distance traffic to the *new monopoly carrier, SDN*, at the SDN switch to be constructed in Sioux Falls. The PUC's order states that SDN shall have a monopoly over all access service *originating or terminating* in the SDN member exchanges and that all long distance carriers shall connect at SDN's switching facility at or near Sioux Falls in order to gain access to the exchanges.

That the centralized equal access facilities proper (i.e., the tandem switch), will allow SDN members to enjoy the many benefits of equal access and that those facilities are in

change carrier to haul the calls across LATA boundaries. South Dakota is a one LATA state. *INTERLATA*—Telecommunication services originating in one LATA or MSA and terminating in another LATA or MSA.
*Interstate/InterLATA*—Telecommunication services originating in one LATA or MSA and terminating in another LATA or MSA. Also originating in one state and terminating in another.
*Interstate/IntraLATA*—Services provided totally within the boundaries of a LATA or MSA which encompasses more than one state.
*INTRALATA*—Telecommunication services originating and terminating within the same LATA or MSA.
*INTRASTATE/INTERLATA*—Telecommunication services provided within the same state boundaries which encompass more than one LATA or MSA.

*INTRASTATE/INTRALATA* —Telecommunication services originating and terminating within the same LATA or MSA and also originating and terminating within the same state.

5. *INTEREXCHANGE CARRIER (IXC)*—A carrier engaged in the provisioning of telecommunications services between two or more exchanges for hire over its own facilities or facilities provided by other carriers. IXCs are considered customers of the Local Exchange Carriers (LECs). LECs provide access facilities so that IXCs can connect to the end-user.

6. *See generally* the January 29, 1990 hearing transcript in Docket No. F–3860, pages 210–12. *See also*, the map appended to this opinion which was introduced as Exhibit 7 in the rebuttal testimony of Edward G. Melichar, dated October 1, 1990 in Docket No. F–3860.

the public interest, is virtually uncontested [7]. *See also*, Docket No. F–3860 Hearing Transcript, dated January 29, 1990. These benefits may include the following: 1+ presubscription FGD in both interLATA and intraLATA jurisdictions; "10XXX" dialing [8]; access to emergency medical service through the SDN facilities; access to state of the art law enforcement; fire and emergency services such as provided by enhanced 911; and signaling system seven when available [9].

Concomitant however with the benefits of equal access are costs when the equal access is intertwined with a monopoly.[10] One monopoly allows SDN to be the only company that will carry all long distance calls which *originate* with customers in SDN member exchanges to the switch in or near Sioux Falls where the calls are turned over to the long distance carriers. This is the originating monopoly. The other monopoly requires that all long distance calls which *terminate* in SDN member exchanges, regardless of their point of origin, be brought by all long distance carriers to the SDN switch and that SDN be the only company allowed to carry those calls to its member exchanges. This is the terminating monopoly. In this appeal, USWC objects only to the terminating monopoly. The damages resulting from the terminating monopoly, though varying as to quantity and quality, are damages nonetheless and unrefuted in the record below.

Inexorably, whether by force of SDN witness testimony or by the PUC brief is the fact that *"only fifty miles"* of USWC cable facilities would *"actually be stranded."* [11] Moreover, the facts show that hundreds of miles of USWC cable facilities would be affected by virtue of being underutilized.[12] The underutilized facilities were engineered to carry the traffic that they now carry, and that will be taken away by the new monopoly.[13]

In addition to the foregoing, USWC will also be deprived of millions of access minutes and their corresponding revenue.[14] Additionally, although the record is unclear, the associated lost revenues and increased cost borne directly by USWC as a result of the terminating monopoly range from $72,000.00 a year to well over two million dollars a year.[15] From the foregoing, the PUC found

7. Amended order granting construction permit and approving tariff (F–3860), finding of fact no. 42 provides, "USWC initially recommended to the Commission that the Commission authorize the SDN project and include as part of that project competitive terminating access on both the interstate and intrastate jurisdictions."

8. *"10XXX dialing"*—In an equal access exchange, a subscriber can choose a toll provider to handle its "1+" dialed calls. The subscriber can also choose different toll providers to handle a particular toll call by dialing: 10 + XXX + 1 + Area Code + Number. The "XXX" is the carrier code for a toll provider other than the particular toll provider that the subscriber selected for a "1+" calling.

9. *"Signaling system 7"*—Provides the signaling network for intelligent switches of the ISDN (Integrated Services Digital Network) age to communicate with one another.

10. There are actually two mandated monopolies in Docket No. F–3860. (Amended order dated April 12, 1991, finding of fact no. 11).

11. Appellee's Brief at 24; SDN witness Douglas F. Martin: "Those are my estimates of their miles [50.4 miles] ... those are stranded...." January 29, 1990 Hearing Docket No. F–3860 at 136.

12. January 29, 1990 Docket No. F–3860 Hearing Transcript at 135, 218.

13. January 29, 1990 Docket No. F–3860 Hearing Transcript at 219.

14. January 29, 1990 Docket No. F–3860 Hearing Transcript at 99–101, 141.

15. Appellee's Brief at 25, quoting Commissioner Stofferahn:

Although the evidence is inconclusive, depending on the split revenue for intra and interstate, it would be a loss of revenue somewhere between as little as $72,000.00 and $750,000.00 based on meet-point billing. January 29, 1990 F–3860 hearing transcript at 215, 258–262:

And right now U S West collects about 1.3 Million per year through the meet-point billing process. That revenue would be lost to us. [A]t a minimum U S West would be required to pay in excess of $600,000.00 for centralized equal access charges to SDCEA. That would occur even if we were not on the SDN ballot anywhere in South Dakota. [ ... ] And then, thirdly, something that was brought to my attention early today during Mr. Martin's testimony was the $940,000.00, amount which he calculated.

that USWC may lose access revenues but that the loss of the access revenue is a direct result of the competition fostered by SDCL 49–31–20 and 49–31–21 under which SDN sought authorization from the PUC to construct its facilities.[16] The applicable South Dakota statutes at that time provided:

SDCL 49–31–20. Merger or consolidation between competing telecommunications companies prohibited—Competing facilities in already served areas prohibited—Authority of commission to permit exceptions.

No association, corporation, or individual organized for the purpose of owning, maintaining or operating telecommunications facilities in this state may consolidate with or hold a controlling interest in the stock or bonds of any telecommunications company owning a competing line, or acquire by purchase or otherwise, competing telecommunications facilities. Nor may such an association, corporation, or individual build or construct telecommunications facilities into or within the territory or community already occupied and served by another tele-communications company as defined by 49–31–1.

An association, corporation or person may file with the commission an application to consolidate or construct telecommunications facilities in a territory being served by another telecommunications company. *If the commission finds after a full investigation, notice and public hearing that the public interest will be benefitted by the consolidation or construction, the commission may issue a permit granting the consolidation or construction.* If the proposed construction is in the territory assigned to telephone cooperatives organized pursuant to Chapter 47–15 to 47–20, inclusive, or municipal telephone systems operated pursuant to Chapter 9–41, or independent telephone companies serving less than ten thousand local subscribers, the commission may issue a permit only upon the additional finding that the company operating the existing facility is not

furnishing reasonably adequate service and will not furnish reasonably adequate service within a reasonable time. Nothing in this section prohibits the construction of nonaccess facilities which cross a territory being lawfully occupied and served by another telecommunications company furnishing reasonably adequate service.

SDCL 49–31–21. Application for permission to construct or extend facilities—Contents of application—Notification to affected companies—Conditions for allowance of competitive facilities—Rights to construct facilities in service areas unaffected.

Any association, corporation or individual before commencing the construction of a telecommunications facility, or an extension of an existing facility outside its lawful territory, shall first apply to the commission for authority to do so. The application shall have attached thereto a plat or map showing the location of the proposed facility. Upon receipt of the application, the commission shall notify any other telecommunications company which may be affected and permit the filing of comments or objections. *The commission may allow, with or without a hearing, competitive facilities if it finds such competition to be in the public interest.* If the proposed location of a competitive facility is in the territory assigned to telephone cooperatives organized pursuant to chapters 47–15 to 47–20, inclusive, or municipal telephone systems operated pursuant to chapter 9–41, or independent telephone companies serving less than ten thousand subscribers, the commission may allow the competitive facilities only upon the additional finding that the company operating the existing facility is not furnishing reasonably adequate service and will not furnish reasonably adequate service within a reasonable time. Nothing in this section prohibits the construction of nonaccess facilities which cross the territory being lawfully occupied and served by another telecommunications company furnishing reasonably adequate

16. Docket No. F–3860, Amended Order Finding of Fact No. 39.

service. Nothing in this section affects construction or extension of facilities within the territory for which a company has the certificate to operate, into contiguous territory which is not receiving similar service, or where a certificated telecommunications company agrees in writing to an attachment of lines to the poles of or to parallel the lines of another certificated telecommunications company.

(emphasis added).

The PUC also found that "[t]he proposed construction of facilities by SDN will not result in significant duplication of existing USWC's facilities nor result in significant USWC stranded plant or investment. The benefits of toll competition and state of the art services provided by the SDN project far outweigh the losses, if any, which USWC alleges it will sustain." [17] Obviously, the circuit court was not unmindful of the legal portent of the foregoing when it stated "[i]t's troubling to think that property would be taken. However, ... it is more important that the balancing made ... between the vast public good done ... against the detriment to US West Communications balances heavily in favor of the SDN decision." [18]

*DOCKET NO. F–3866.*

Lightwave, Interstate and McCook are members of SDN. In this decision, the PUC approved the construction of the McCook facilities and also granted Lightwave and ITC permission to carry intrastate traffic. USWC is currently transporting intrastate traffic to and from exchanges operated by Lightwave and Interstate and is transporting interstate traffic and intrastate traffic to and from exchanges operated by McCook. The Lightwave facility considered in this docket is the same facility authorized by the PUC in Docket No. F–3699. The interstate facility considered in this docket was previously approved by the PUC in Docket No. F–3832. The PUC found that the proposed access transport lines were necessary to connect the local exchanges served by Brookings, ITC,

McCook and Sioux Valley with the SDN centralized equal access system. The PUC also found that this connection will allow the local telephone exchanges to enjoy competitive long distance service [19] and realize benefits provided by the centralized equal access system. The PUC granted a monopoly on originating and terminating intrastate traffic. Consequently, USWC will no longer be allowed to carry its own long distance traffic or the traffic of other long distance carriers over its existing facilities to the exchanges operated by those three companies. The meet point for the McCook and SDN facilities will be in the service territory of USWC.

*DOCKET NO. F–3699.*

The facility constructed pursuant to this docket is the same facility whose capacity and use is altered by order in Docket No. F–3866 where the PUC approved the construction and operation by Lightwave of a fiber optic toll facility to Sioux Falls. The facility was authorized by the PUC to connect with SDN's centralized equal access tandem switch when the SDN switch is constructed. Commissioner Stofferahn dissented in the original order in this docket, stating "In my opinion, conditions necessary for a competitive environment, ... must be a part of the application before the Commission can permit the facility in the public interest."

## STANDARD OF REVIEW

█ SDCL 1–26–37 controls this Court's scope of review from decisions of administrative agencies. *Northwestern Bell v. Public Util. Com'n*, 467 N.W.2d at 469. We review the agency decision in the same manner as the circuit court, and there is no presumption that the circuit court's decision is correct. *Id.* Questions of law such as statutory interpretation are reviewed by this Court *de novo. Appeal of Schramm*, 414 N.W.2d 31, 33 (S.D. 1987). No deference is given to the interpretation of the trial court, nor to the agency's conclusions of law. The issues before this Court are clearly a question of law. Moreover, this Court may reverse or modify the PUC decision where substantial rights of the

---

**17.** Amended Order Docket No. F–3860, Finding of Fact No. 45.

**18.** Civ. No. 91–154, Transcript of Oral Argument at 53.

**19.** *See* caveat, *supra* at 119.

appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

 (1) In violation of constitutional or statutory provisions;

 (2) In excess of the statutory authority of the agency;

 (3) Made upon unlawful procedure;

 (4) Affected by other error of law;

 (5) Clearly erroneous in light of the entire evidence in the record; or

 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

SDCL 1–26–36.

## ISSUE I.

WHETHER THE PUC HAS EXCEEDED ITS STATUTORY AUTHORITY UNDER SDCL 49–31–20 AND 21 IN ORDERING A MONOPOLY, TO–WIT: THAT ALL SWITCHED ACCESS TELECOMMUNICATIONS TRAFFIC TERMINATING IN SDN MEMBER EXCHANGES MUST BE ROUTED THROUGH SDN'S CENTRALIZED EQUAL ACCESS SWITCHING FACILITY LOCATED IN SIOUX FALLS.

The PUC approved the monopoly facilities in question under the auspices of SDCL 49–31–20 and 49–31–21, *supra.* Generally, the PUC contends that USWC has "grossly misinterpreted" the statute and that the general public interest standard was intended to give the PUC broad discretion in its review of telecommunication facilities construction.

 The purpose of statutory construction is to discover the true intention of the law which is to be ascertained primarily from the language expressed in the statute. *Appeal of AT & T Information Systems,* 405 N.W.2d 24 (S.D.1987). The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used. *Id.*

 Words and phrases in a statute must be given their plain meaning and effect. *Id.* When the language of a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed. *Id.*

 Since statutes must be construed according to their intent, the intent must be determined from the statute as a whole, as well as enactments relating to the same subject. *Id.* But, in construing statutes together it is presumed that the legislature did not intend an absurd or unreasonable result. *Id.* When the question is which of two enactments the legislature intended to apply to a particular situation, terms of a statute relating to a particular subject will prevail over general terms of another statute. *Nelson v. School Bd. of Hill City S.D.,* 459 N.W.2d 451 (S.D.1990). Moreover, it is presumed that the legislature does not intend to insert surplusage in its enactments. And, where possible, the law must be construed to give effect to all of its provisions. *Id.* at 455.

 The plain meaning of the statutes, with the specific language controlling the general, is that the PUC may allow "competitive facilities if it finds such competition to be in the public interest." SDCL 49–31–21. That competition and monopoly are diametrically opposed, goes without saying. Because the language is clear and unambiguous, concomitant with the intent flowing therefrom, we hold that the PUC has exceeded its statutory authority in granting SDN a monopoly for switched access telecommunications services through the use of telecommunication facilities located outside its lawful territory and in a territory occupied and served by USWC. The PUC is not clothed with an unlimited discretion. The statutes from which its powers are derived serve also to mark the boundaries of those powers. *Application of Megan,* 69 S.D. 1, 5 N.W.2d 729 (1942). Therefore, to the extent that the PUC's orders, affirmed by the circuit court, grant a terminating monopoly in direct contravention of the statutory mandate, they are now reversed.

## ISSUE II.

WHETHER THE PUC HAS ACTED IN VIOLATION OF SDCL 49–31–17 BY REQUIRING ALL LONG DISTANCE CARRIERS TO CONNECT AT SDN'S SWITCHING FACILITY IN SIOUX FALLS.

 USWC contends that the PUC exceeded its statutory authority in conclusion of

law No. 14 of the amended order in Docket No. F–3860 which provides:

> 14. SDCL 49–31–15 through 49–31–17, inclusive, allow the Commission to compel access at exchanges. The access being requested by SDN falls within the requirements of those statutes. Accordingly, the Commission has authority to compel access at USWC's exchange in Sioux Falls, South Dakota, as proposed in the SDN application.

The specific contested statute provides:

> Notwithstanding §§ 49–31–15 and 49–31–16, no access may be compelled except at exchanges, and nothing in those sections may be construed to prevent telecommunications companies from providing access to each others' facilities by mutual consent.

SDCL 49–31–17.[20]

Initially, we think that it is important to note that the contested statute along with the other statutory provisions dealing with access have been a part of the law in South Dakota since 1907. It is apparent to us that SDCL 49–31–17 was enacted to protect local exchange carriers from forced connections far from their exchanges which, obviously, are financially taxing on those small companies. Moreover, such a forced construction, out of context with the original intent of the statute, would necessarily eliminate centralized equal access tandems such as SDN's,

which USWC has not contested and which all agree is in the public interest.

Consequently, once again employing the aforementioned principles of statutory construction, we hold that the PUC has not exceeded its authority under the applicable statutes[21] and affirm the circuit court's decision in that regard.

■ Finally, we also find that the subsequent amendment to SDCL 49–31–17 was instructive in gleaning the legislative intendment of the law.[22] *Application of Farmers State Bank*, 466 N.W.2d 158, 160 (S.D.1991). An amendment to clarify the law may be looked to in order that the rights under the original act may be determined. *Id.*

### ISSUE III.

WHETHER THE PUC HAS VIOLATED SOUTH DAKOTA CONSTITUTION ART. VI, §§ 2 AND 13 BY GRANTING A TERMINATING ACCESS MONOPOLY AND PREVENTING USWC FROM USING ITS OWN EXISTING TELECOMMUNICATIONS FACILITIES TO TRANSPORT ITS LONG DISTANCE TELECOMMUNICATIONS TRAFFIC TO SDN MEMBER EXCHANGES.

■ In appealing to this Court from the PUC's final decisions in Dockets F–3860, F–3866 and F–3699, USWC does not contend that the PUC should have rejected the con-

---

**20.** This statute as well as others in Chapter 49–31 were changed and substantially clarified by Senate Bill 75 subsequent to the inception of this litigation.

**21.** SDCL 49–31–15 provides:

> The Commission may compel access to telecommunications facilities in this state. Any telecommunications company desiring access to any other company's facilities, shall, if access is refused, make an application to the commission. Upon receipt of the application the commission shall ascertain the facts in the case, and, if in its judgment the public service demands the access and the facilities of the applicant are in proper condition, the commission may order the access and apportion the expense thereof.

SDCL 49–31–16 provides:

> If any telecommunications company has constructed its line to the corporate limits of any city or town and is denied the privilege of

accessing telecommunication lines within the corporate limits, the commission may, in its discretion, compel the availability of access by the company or companies interested therein and the expense of the access shall be borne by the companies interested, in such manner as the commission determines.

SDCL 49–31–18 provides:

> Every telecommunications company shall provide access for any other telecommunications company doing business in the same vicinity that makes application therefor and shall afford all reasonable and proper facilities for such access, for reasonable compensation and without discrimination, and under rules the commission may prescribe.

**22.** The 1992 amendment, at the end of the first sentence substituted "or within the local exchange boundary, *or a centralized point serving several exchanges* of the telecommunications company refusing the access" for "exchanges, and nothing."

struction of the proposed facilities by SDN, Lightwave, ITC and McCook. USWC only challenges the PUC's order mandating SDN's and its member companies terminating switched access telecommunications traffic monopoly.

Specifically, in granting the application for construction filed by SDN in Docket F–3860, the PUC expressly ordered that "SDN–SDCEA shall have a monopoly over all switched access service ... terminating in the SDN member exchanges." *April 12, 1991 Amended Order F–3860* at 11. Furthermore, it was ordered that "all interexchange carriers shall connect at SDN's tandem switch at or near Sioux Falls to gain access to the SDN member exchanges." *Id.* at 12. The PUC's final decision in Docket F–3866, addressing fiber optic transport facilities owned by Lightwave, ITC and McCook, includes similar language. Consonant with the PUC's decision in F–3860, the order also states that "[t]he Petitioners [Lightwave, ITC and McCook] shall have a monopoly over all switched access service ... terminating in the member exchanges." *June 12, 1991 F–3866 Order* at 8. Finally, the PUC ordered that the "telecommunications facilities and telecommunications services granted by this Order shall be considered components of SDN/SDCEA. As such, the applicants must abide by all conditions and regulations set for SDN/SDCEA in the Commission's Final Order in Docket F–3860. Said Order is hereby incorporated by this reference." *Id.*

As previously stated, USWC has in place facilities which allow it to transport long distance telecommunications traffic to each of the seventy-six exchanges operated by SDN member companies. However, as a result of the above-referenced orders, USWC will no longer be allowed to use those existing facilities to transport traffic to each of the SDN member exchanges. Consequently, USWC, as well as all other long distance carriers, will be required to connect with SDN's tandem switch at Sioux Falls in order to gain access to the SDN member exchanges. The PUC's order makes SDN the only authorized carrier of all traffic from the SDN switch terminating at each of the seventy-six member exchanges. The PUC ordered that no later than twenty-four months after commencing service "SDN–SDCEA shall present evidence to the Commission at such time which shows the effects of being granted a terminating access transport monopoly and what affect the elimination of this monopoly would have on SDN–SDCEA." *April 12, 1991 Amended Order F–3860* at 12.

To refute USWC's claimed taking, the PUC contends that there was no taking because the monopoly was a reasonable regulation, there is no protected property right in the transport of terminating access traffic, or assuming there is a property interest, the property was appropriately taken in the public interest, or that the taking is merely temporary.

At the outset we note the heavy reliance on the omniumgatherum of Iowa Utility Board decisions, Iowa District Court and Supreme Court decisions, and Federal Communications decisions, which we find unpersuasive of the propositions for which they are cited. Our reasons are manifest. The authorities cited did not even address the constitutional issue of a regulatory taking. It is well settled that a case is not precedent for that which it did not consider. "Questions which merely lurk in the record, neither brought to the attention of the Court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *KVOS v. Associated Press,* 299 U.S. 269, 279, 57 S.Ct. 197, 81 L.Ed. 183, 189 (1936). Moreover, "[t]his Court establishes its own precedent and is not bound by divergent law established in other jurisdictions." *Fisher v. Sears, Roebuck & Company,* 88 S.D. 1, 214 N.W.2d 85, 89 (1974). The Iowa statutes also bear no resemblance to the applicable South Dakota statutes. The Iowa proceedings were in the nature of a tariff docket, where the South Dakota proceedings were in the nature of a construction docket.[23]

---

23. SDN witness, Douglas F. Martin cavalierly stated as much:

Iowa was a different situation from this point of view, as I understand it ... in South Dakota we first need to file to get permission to even

Moreover, Iowa has given an interexchange utility the option to use its own existing facilities to provide local access transport service to terminate its own traffic. *Northwestern Bell Telephone Co. v. Farmers Mutual Telephone Co. and Iowa Network Services, Inc.*, Docket FCU–90–6. And the Iowa Utilities Board has promulgated an "Order Commencing Rule Making" which will require the access tariffs of all local exchange utilities to allow the aforementioned. *In re: Terminating Local Access Transport Service*, Docket No. RMU–92–4, June 8, 1992. Finally, we find the following quote from an Iowa circuit court compelling:

> The Court agrees that from NWB's [Northwestern Bell] point of view this was a harsh regulatory decision by the Board. It seems the Board has balanced the economic viability of INS [Iowa Network Services] on the back of NWB by removing NWB from the business of terminating equal access for PTC's [Participating Telephone Company] and requiring NWB to pay INS to perform the service.

*Northwestern Telephone Co. v. Iowa Utilities Board*, No. AA–1450, No. AA–1466 (Iowa, December 18, 1989).

■ Our Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law" and that no "[p]rivate property shall be taken for public use, or damaged, without just compensation ...". S.D. Const. art. VI, §§ 2, 13.[24] We have previously said:

> long before the founding of the American Colonies it had become thoroughly established, as part of the English law, that it was unlawful to take the property of an individual for even a public use without making due compensation therefor. The taking of private property without compensation must have been especially repug-

nant to those people such as those who founded our present government—the very corner stone of which is the equality of men before the law.

*Hyde v. Minnesota D. & P. Ry. Co.*, 29 S.D. 220, 136 N.W. 92, 95 (1912). The taking of private property without just compensation is merely confiscation, and offends the constitution. *Application of Northwestern Bell Tel. Co.*, 69 S.D. 36, 6 N.W.2d 165 (1942).

The regulatory taking by any other name is still a regulatory taking. "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Yee v. Escondido*, 503 U.S. ——, 112 S.Ct. 1522, 1529, 118 L.Ed.2d 153, 166 (1992) *quoting* Justice Holmes in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322, 326 (1922). Thus, while the PUC may require a reasonable connection of public telecommunication lines, the imposition of additional conditions may cause that order to contravene the constitution. *Blackledge v. Farmer's Ind. Tel. Co.*, 105 Neb. 713, 181 N.W. 709 (1921). Consequently, where the PUC not only mandates physical connection of telecommunications lines, but also mandates that traffic originating on USWC's lines be transferred to SDN's facilities, thereby depriving USWC of the right to use its own facilities for the haul, the PUC order is an unconstitutional regulatory taking. *Gilman v. Somerset Farmers Co-op Telephone Co.*, 129 Me. 243, 151 A. 440, 441–442 (1930). In words of the Maine Supreme Court,

> A connection unreasonably · depriving a telephone company of the right to use its own lines, is an injustice.
>
> The Public Utilities Commission may, to some extent, affect and curtail the property and property rights of public utilities,

---

construct it. And it is my understanding that that wasn't an issue in Iowa. The issue in Iowa is simply a tariff matter. So the entire Iowa docket was really the tariff. You know, within the docket once they get going with it it becomes the entire issue of INS. But this is a construction docket. That was a tariff docket. And SDN, assuming it is approved, will then come back to the Commission with a tariff.... *January 29, 1990 Docket F–3860 hearing* at 173–174.

24. Similarly, the 5th Amendment of the United States Constitution provides "Nor shall private property be taken for public use, without just compensation," and applies to the States through the 14th Amendment. *Chicago, B & Q R Co. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

but the commission may not, under the guise of supervision, regulation, and control, take such property and rights. *Id.*, 151 A. at 443. The Minnesota Supreme Court, citing with approval *Gilman*, ruled in a similar fashion that to deprive a telecommunications company of the use of its own facilities to make a haul as far as its lines extend is invalid. *Tri–State Telephone Co. v. Intercounty Tel. Co.*, 211 Minn. 496, 1 N.W.2d 853, 859 (1942). "[T]he constitution measures a taking of property not by what [the PUC] says, or by what it intends, but by what it does." *Hughes v. Washington*, 389 U.S. 290, 298, 88 S.Ct. 438, 19 L.Ed.2d 530, 536 (1967) (Stuart, J., concurring). "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal Co., supra*, 260 U.S. at 416, 43 S.Ct. at 160, 67 L.Ed. at 326. We therefore hold that the PUC's order mandating USWC to turn over its telecommunications traffic at the SDN tandem in Sioux Falls unconstitutionally deprives them of their property by not allowing the haul to be completed over USWC's own facilities. Similarly, to the extent that that order causes stranding of approximately fifty miles of USWC's cable facilities, that also constitutes an unconstitutional regulatory taking. To deny USWC economically viable use of its property effects a taking. *Lucas v. So. Carolina Coastal Council*, 505 U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Keystone Coal Association v. DeBenedictis*, 480 U.S. 470, 485, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987).

■ Likewise, there exists a property right in USWC's right to transport its terminating switched access traffic the length of its facilities.[25] We have construed property to mean "the exclusive right to possess, enjoy, and dispose of, a thing." *Hyde, supra*, 136 N.W. at 95. Obviously then, that includes the right to transport terminating switched access traffic. *Blackledge; Gilman;* and *Tri–State Telephone Co., supra.*

■ The public interest is not a talisman in whose presence an unconstitutional taking fades away. While the public interest is necessary for a constitutional taking, it is not sufficient. *Pennsylvania Coal Co., supra; Delaware L. & W. R. Co. v. Morristown*, 276 U.S. 182, 48 S.Ct. 276, 72 L.Ed. 523 (1928). Therefore, findings of fact Nos. 39, 45 and 47 of the April 12, 1991 amended order, Docket No. F–3860 and finding of fact No. 27 in the June 12, 1991 order, Docket No. F–3866 are in violation of SDCL 1–26–36(1).

The law also does not give countenance to the contention that there is no taking merely because the taking is brief. That the PUC's Procrustean bed is potentially ephemeral is of no less moment, and necessarily must fall when brought to bear under the weight of this State's Constitution. S.D. Const. art. VI, §§ 2 and 13; *Lucus, supra; First Lutheran Church v. Los Angeles County*, 482 U.S. 304, 321, 107 S.Ct. 2378, 2389, 96 L.Ed.2d 250 (1987). Thus, even though the PUC indicated that it would be SDN's burden to prove after the initial two years that it justified further monopoly protection, our constitution is still violated. *Id.*

We hold that the PUC's orders granting construction of monopoly facilities in contravention of SDCL 49–31–20 and 21 constitute a taking entitling USWC to compensation for inverse condemnation. Although cases of the United States Supreme Court have been cited, we decide this case solely on the basis of the South Dakota Constitution. In summary then, we hold that the PUC has exceeded its statutory authority in granting SDN a monopoly for construction of terminating switched access telecommunications facilities, that the PUC has not exceeded its statutory authority in compelling access at the Sioux Falls facilities and that USWC is entitled to compensation for inverse condemnation.

**25.** Surely, PUC's contention that "USWC is not being deprived of the right to originate its' own traffic; instead it is not being allowed to transport ...", is semantic legerdemain. *Appellee's Brief* at 31. To be able to originate traffic and yet not be allowed to haul it over the facilities that have been constructed for that traffic means little. Certainly, SDN would be nonplused if it was allowed an originating monopoly for its traffic, yet was not allowed to haul it over its own facilities.

The case is remanded for proceedings not inconsistent with this opinion.

MILLER, C.J., and HENDERSON J., concur.

SABERS and AMUNDSON, JJ., concur specially.

FITZGERALD, Circuit Judge, for WUEST, J., disqualified.

**Legend**

- - - - - ILEC Provided Facilities

———— SDN Provided Facilities

O ILEC End Office

□ ILEC 4X Office

◙ SDN AccessTandem

⊗ U S WEST Town

· · · · · · · · · U S WEST Provided Facilities

SABERS, Justice (concurring specially).

I write specially to point out that SDN's facilities have not been constructed and have not physically replaced USWC's facilities yet. Likewise, "fifty miles of USWC's cable facilities" have not yet been stranded. Therefore, because the PUC's order is reversed by us, there has been a taking *in theory only* and the majority's statement that "USWC is entitled to compensation for inverse condemnation" is premature and in error. The opinion should not hold that "USWC is entitled to compensation for inverse condemnation" without additional explanatory or limiting language.

AMUNDSON, Justice (concurring specially).

I concur in total with the majority's position on Issue I that there is no statutory authority for the establishment of a monopoly for the benefit of SDN.

On Issue II, I concur with the understanding of the majority position being that the PUC can require USWC to connect its lines to SDN's exchange, but this does not foreclose USWC from using its own facilities for carrying its generated traffic to the SDN member exchanges already in place. Otherwise, would we not be granting a monopoly to SDN.

Finally, I concur on Issue III to the extent that USWC should be allowed to seek compensation for any regulatory taking for so long as the monopoly granted by the PUC was in effect.